## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION (JACKSON)

Case No. 1:17-01079-STA-jay

UNITED STATES OF AMERICA *ex rel.*
GURPREET MAUR, M.D.

       Plaintiff,

-vs-

ELIE HAGE-KORBAN, M.D.,  DELTA          **JURY TRIAL DEMANDED**
CLINICS, PLC, d/b/a THE HEART and
VASCULAR CENTER OF WEST TENNESSEE,
COMMUNITY HEALTH SYSTEMS, INC.,
KNOXVILLE HMA HOLDINGS, LLC d/b/a TENNOVA
HEALTHCARE, JACKSON HOSPITAL CORPORATION
d/b/a REGIONAL HOSPITAL OF JACKSON, and
DYERSBURG HOSPITAL COMPANY, LLC, d/b/a
DYERSBURG REGIONAL MEDICAL CENTER.

       Defendants.

## <u>AMENDED COMPLAINT</u>

(False Claims Act, 31 U.S.C. §§3729 et seq.)

COMES NOW Plaintiff/Relator, Gurpreet Maur, M.D., acting on behalf of and in the name of the United States of America, and files this Amended Complaint under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 et seq, and alleges as follows:

## PRELIMINARY STATEMENT

1.      Relator brings this lawsuit based on the Defendants' submission of false claims to government insurance programs for wholly unnecessary cardiac testing and procedures. Specifically, Defendants herein actively participated in blatant overutilization of cardiac medical services which were unnecessary or not medically indicated, including but not limited to Nuclear stress imaging, echocardiogram, angiography, angioplasty, stenting, and coronary CT angiography (CTA).

2.      An unfortunate reality of the current healthcare system is that patients, and by extension, their insurers or payors, must have incredible faith that healthcare providers will only perform and bill for necessary medical care.  Insurers and regulators simply cannot be in every operating room, or review every claim submitted in order to follow up on each purported service provided.

3.      In order to verify this level of trust, providers who treat government-insured patients are contractually obligated to agreements and sign certifications which specifically require them to only provide and bill for medically necessary care under penalty of law.  Insurers and regulators, as well as society at large, rely upon the truthfulness and candor of these physicians as professionals.

4.      Another unfortunate reality of modern healthcare is that hospitals must keep their highly profitable operating rooms full in order to cover losses from other less profitable departments.  As a result of this financial pressure, hospitals are often forced to recruit or

incentivize physicians who can keep the operating rooms full of legitimate patients, or look the other way while less scrupulous physicians undertake unnecessary procedures in their facilities. In either instance, the hospital still profits from full operating rooms.

5.     To verify or monitor these potential conflicts, hospitals are required to implement several quality assurance measures.  As laid bare in this complaint, two local hospitals, formerly owned by Defendant Community Health Systems, Inc., opted to allow Dr. Korban to continue providing medically unnecessary procedures in their hospitals.

6.     When providers are caught billing for services which are unnecessary, they are guilty of health care fraud.  When this occurs, providers are often bound to contracts called Integrity Agreements (hereinafter "IA") with the Office of the Inspector General for the Department of Health and Human Services (hereinafter "OIG-HHS").  The IA outlines the obligations which an individual or entity accepts as part of a civil settlement involving allegations of health care fraud.  An individual or entity agrees to the IA obligations and in exchange, the OIG agrees not to seek to exclude the entity from participation in Medicare, Medicaid, or other Federal health care programs.  IAs have common elements, but each one is also tailored to address the specific facts or covered conduct of the case and may incorporate elements of a defendant's preexisting compliance program.

7.     These integrity agreements are intended to provide an additional guarantee or layer of accountability to ensure that providers will only perform and bill for medically necessary care. The typical IA contains compliance, monitoring and auditing provisions which subject the offender to heightened scrutiny.  When providers violate IAs, they often trigger stipulated penalty provisions and risk their ability to participate in HHS programs.  This is due not only due to violating the contract with OIG-HHS itself, but also by virtue of the exclusionary authority found

in 42 USC §1320a-7.   One of the purposes for binding violators to an IA after settling investigations or litigation is to use monitoring or supervision to deter repeat violations.

8.      As more fully conveyed herein, despite being party to an IA, Defendant Elie Hage-Korban, MD (hereinafter "Dr. Korban") continued his fraudulent practices.    For example, in November 2016, Dr. Korban was disciplined by the Tennessee Department of Health for medical business advertisements in which untrue or misleading statements were made.   More specifically, Dr. Korban was part owner, medical director and Chairman of the Board of a medical spa.   He allowed an employee, who did not have a medical license, to hold herself out as a medical doctor to patients, staff and in advertisements.   Again, Dr. Korban entered into a settlement agreement and was fined.   Subsequently, Dr. Korban faced additional discipline and was subjected to fines in Illinois, Michigan and Florida, states where he also holds a medical license.   This additional discipline stemmed not only from Dr. Korban's underlying wrongdoing, but also from his failure to timely disclose the Tennessee Order as required.

9.      However, this matter does not merely implicate a single recalcitrant cardiologist. Rather, this case also implicates Dr. Korban's cardiology practice group, Delta Clinics PLC d/b/a Heart and Vascular Center of West Tennessee (hereinafter "Delta"), national hospital owner/operator Community Health Systems, (hereinafter "CHS"), its regional operating entity Tennova Healthcare (hereinafter "Tennova"), and two local hospitals; Regional Hospital of Jackson (hereinafter "RHJ") and Dyersburg Regional Medical Center (hereinafter "DRMC").

10.     Defendants CHS, RHJ, and DRMC shielded themselves and Defendants Dr. Korban and Delta from any scrutiny or oversight in order to protect their profit stream.   In doing so, Defendants were all able to defraud the government and collect substantial government payments to which they were not rightfully entitled, to the detriment of the government and its

taxpayers.

11.     Despite the existence of the IA, the practices which formed the basis for the prior settlement and related IA actually persisted while the agreement was in place, as well as through the filing of this complaint.  Clearly the agreement, which entailed the formation of an Independent Review Organization (IRO) to oversee and review Dr. Korban's practices, was insufficient to rein in the behavior of a recalcitrant fraudster.  Moreover, Defendant CHS was also under an unrelated but nearly identical Corporate Integrity Agreement (CIA), executed on July 23, 2014 related to its operation of Laredo Medical Center.  In short, the allegations are not news to these Defendants, rather, the instant allegations are the perpetual modus operandi of the Defendants.

## PARTIES

### A.     Relator

12.      Under the False Claims Act, a person or persons with knowledge of false or fraudulent claims against the Government (a "Relator") may bring an action on behalf of the federal government, state government(s), and themselves. Relator, Dr. Gurpreet Maur is an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

13.     Gurpreet Maur, M.D., was a resident of Jackson, Tennessee during all relevant times of this amended complaint.  Dr. Maur is Board Certified in Interventional Cardiology and is licensed to practice medicine in the states of Tennessee and South Carolina.  Dr. Maur began working for Delta in 2016 as an Interventional Cardiologist and eventually resigned his position before moving to South Carolina.

14.     But for Dr. Maur bringing this information to light in the form of this complaint, these schemes would continue ad infinitum.

## B.      Defendants

15.      Community Health Systems, Inc. (CHS) is a for-profit corporation, organized under the laws of the state of Tennessee.  It maintains its headquarters at 4000 Meridian Blvd., Franklin, Tennessee, 37067.  According to their website, "Community Health Systems, Inc. is one of the nation's leading operators of general acute care hospitals.  The organization's affiliates own operate or lease 158 hospitals in 22 states with approximately 26,000 licensed beds."[1]

16.      Knoxville HMA Holdings, LLC d/b/a Tennova Healthcare is a wholly owned subsidiary of Community Health Systems, Inc.  It maintains its headquarters at 4000 Meridian Blvd., Franklin, Tennessee, 37067.  Tennova is organized into regions within Tennessee.  The two hospitals at issue in this matter fall within the Western Region of Tennova at all times material to this action.

17.      At all times material to this action, Jackson Hospital Corporation f/k/a Regional Hospital of Jackson was a wholly owned subsidiary of Tennova Healthcare and conducted business at 367 Hospital Boulevard, Jackson, Tennessee, 38305.  Jackson Hospital Corporation also operated under the legal name Jackson, Tennessee Hospital Company, LLC and assumed names Tennova Healthcare- Regional Jackson and Tennova Healthcare- Regional Hospital of Jackson. Jackson Hospital Corporation uses NPI number 1023089984.

18.      At all times material to this action, Dyersburg Hospital Company, LLC a/k/a Dyersburg Regional Medical Center was also a wholly owned subsidiary of Tennova Healthcare and conducted business at 400 E. Tickle Street, Dyersburg, Tennessee, 38024.  Dyersburg Regional Medical Center operated under the legal name Dyersburg Hospital Company, LLC, formerly Dyersburg Hospital Corporation and uses assumed names Tennova Healthcare-

[1] See www.chs.net

Dyersburg Regional and Tennova Healthcare- Dyersburg Regional Medical Center.  Dyersburg Hospital Company, LLC uses NPI number 1043282338.

19.     Elie Emile Hage-Korban, M.D., is licensed by the state of Tennessee to practice Internal Medicine with his original license granted on November 14, 2002 and expiring on July 31, 2018.[2]  Dr. Korban received his M.D. from the American University of Beirut, Beirut, Lebanon in January 1997.  He is board certified in Internal Medicine and Nuclear Cardiology. Upon information and belief, no hospital staff privileges have been reported to the Tennessee Department of Health on his behalf.

20.     Dr. Korban resides at 22 Deepwood Drive, Jackson, Tennessee, 38305, and owns and operates Delta Clinics PLC., d/b/a The Heart and Vascular Center of West Tennessee, P.C., 17 Centre Plaza Drive, Jackson, Tennessee, 38305.  His NPI number is 1679511026 and his Tennessee License No. is 36932.  Dr. Korban also holds medical licenses in Florida (License No. ME0129843), Illinois (License No. 036121914), Alabama (License No. 30902) and Michigan (License No. 43-01-071173).

21.     Delta Clinics PLC, d/b/a The Heart and Vascular Center of West Tennessee, P.C., is a for-profit professional corporation, organized under the laws of the state of Tennessee.  It maintains its headquarters at 9486 Highway 412W, Lexington, Tennessee, 38351, with a mailing address of 17 Centre Plaza Drive, Jackson, Tennessee, 38305 and uses NPI number 1629016399. Upon information and belief, Dr. Korban is the sole owner of Delta and otherwise completely controls its operations.

---

[2] Information obtained at https://apps.health.tn.gov/Licensure/Results.aspx, though a current search for license verification is inconclusive.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this Amended Complaint pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §3732(a).

23.     All of the alleged acts which form the basis of this Amended Complaint arose in the Western District of Tennessee.  In addition, DRMC, RHJ and Delta are corporations organized and existing under the laws of the State of Tennessee, with their principal places of business and offices in the Western District of Tennessee.  Accordingly, venue in this district is proper pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a).

24.     Relator, Gurpreet Maur is a citizen of the United States of America. Dr. Maur is suing in the name of and on behalf of the United States of America under the qui tam provisions of the False Claims Act.

25.     None of the allegations set forth in this Amended Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media, rather they are the declarations of the Relator as an original source.

26.     Relator has direct and independent knowledge within the meaning of 31 U.S.C. § 3730(e)(4)(B) of the information on which the allegations set forth in this Amended Complaint are based upon, and he has voluntarily provided the information to the government prior to filing this Complaint.

27.     As required by 31 U.S.C. § 3730(a)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the District of Western District of Tennessee, in advance of filing of this Complaint, a declaration of material evidence and information related to this Complaint.

## FACTUAL BACKGROUND

28.     Defendant Dr. Korban, along with his medical practice Delta, was and is engaged in the private practice of diagnostic and interventional cardiology (the medical specialty involved in the diagnosis and treatment of heart disease).  Dr. Korban, along with hospital Defendants DRMC and RHJ, engaged in a scheme built upon Dr. Korban's ordering and performing of numerous unnecessary diagnostic studies, unnecessary heart catheterizations, diagnostic coronary angiography and other unnecessary coronary and peripheral intervention procedures.

29.     While the United States and several private insurance companies were essentially fleeced financially by this conduct, the true victims of these schemes were the numerous patients who lacked appropriate indications for the invasive, expensive and dangerous interventions.

30.     After conducting unnecessary or excessive testing, Dr. Korban, or others acting at his direction, subsequently performed unnecessary interventional procedures on numerous patients, including, but not limited to coronary artery catheterization, angiography, angioplasty and stenting.

31.     In most, if not all of these cases, the involved patients were hospitalized prior to or thereafter, or both at either DRMC or RHJ needlessly and without appropriate indication, other than recuperation from the procedure they had just unnecessarily undergone.

32.     Starting almost immediately upon Relator's employment with Dr. Korban, Relator personally observed inappropriate and medically unnecessary cardiac procedures being performed by Dr. Korban and other Delta physicians directed by Dr. Korban.

33.     Relator would regularly view cases of medically unnecessary procedures by reviewing patient charts or films.  Films documenting Dr. Korban's unnecessary stenting were commonly displayed in the catheterization lab viewer.  Perhaps most troubling, Dr. Korban or

other Delta physicians would call on Relator's patients after Relator had determined no tests or procedures were necessary for the patients. Yet, Dr. Korban or other Delta physicians would order tests or conduct procedures in contravention of Relator's orders or opinions.

34. The procedures ordered by Dr. Korban were invasive cardiology procedures. Often, Dr. Korban would order ambulance transport of patients to both DRMC and RHJ for unnecessary heart catheterization, diagnostic coronary angiography and various coronary and peripheral intervention procedures. To be clear, these patients lacked appropriate indications for diagnostic and therapeutic intervention. In such cases, not only were the procedures or tests unnecessary, but the expensive ambulance transport was similarly uncalled for.

35. Consistent with a scheme he had previously perpetrated, Dr. Korban would falsely claim in patient charts that the patient complained of chest pain, but that the stress test had come out negative. A negative stress test normally indicates that the chest pain is not the result of a heart problem. However, Dr. Korban would admit these patients to one of the Defendant hospitals. In most, if not all of these cases, Dr. Korban, or others at his direction, thereafter performed unnecessary interventional procedures, including, but not limited to coronary artery catheterization, angiography, angioplasty and stenting.

36. In connection with unnecessary stent procedures, Dr. Korban or other Delta physicians would also prescribe blood thinners in their aftercare plan. The long-term use of these medications was necessitated solely by the implantation of the otherwise unnecessary stents. Even with the advent of generic versions, these blood thinner medications add substantial costs, and pose long term risks, to patients who frankly should have never received stents in the first place, let alone the lifetime of medication that comes with such procedures.

37. RHJ and DRMC directly, while CHS and Tennova indirectly, filed claims for the

hospitalizations and facility fees related to the unnecessary procedures, collecting payments from the federal payor programs on behalf of those insured beneficiaries.

## PRIOR FRAUD INVOLVING DR. KORBAN

38.     The practice of performing unnecessary procedures and ordering unnecessary tests is not new to Dr. Korban.

39.     Upon information and belief, Dr. Korban's performance of unnecessary cardiac and stent procedures previously resulted in him being censured by a local hospital, Jackson-Madison County General Hospital in the mid-2000s.

40.     More directly, this exact scheme was previously detailed and exposed in a prior qui tam case brought by Dr. Wood Demming against Dr. Korban and RHJ, (among other Defendants) on June 13, 2007.  The central allegations in the Demming complaint were that Defendants had billed Medicare and Medicaid for medically unnecessary cardiac stent placements during the time period of January 1, 2005 through December 31, 2008.

41.     In addition, there were allegations that the Defendants were in violation of AKS and Stark laws based upon unlawful financial arrangements between certain hospitals and Dr. Korban.  Not only does the instant complaint make nearly identical claims about Dr. Korban's current practices, but upon information and belief, these same types of financial arrangements persist to this day.

42.     The United States eventually intervened in Dr. Demming's case and settled the claims with the Defendants therein.  Specifically, the United States Department of Justice announced on December 19, 2013 that Dr. Korban had agreed to pay $1.15 million to settle the claims against him.

43.     On May 7, 2015, Jackson-Madison County General Hospital paid $1,328,465 to

resolve their involvement in the alleged practices.

44.    On July 15, 2015 Regional Hospital of Jackson (RHJ) announced it too had settled the allegations in the Demming case.  RHJ paid $510,000 to resolve their liability in the matter.

45.    As a condition of the settlement, Dr. Korban entered into an Integrity Agreement (IA) with OIG-HHS.  This IA was in effect from November 13, 2013 through November 13, 2016, and importantly, remained in place during the time period of most of the allegations herein.

46.    Dr. Korban's IA required that an independent review organization (IRO) monitor:

*Coding, billing and claims submission to all Federal health care programs by or on behalf of Korban, and reimbursement records for cardiology items and services for each 3-month period during the term of the Integrity Agreement.*

47.    The IA also called for a review of:

*Cardiac procedures including interventional cardiac procedures (including catheterization, angiographics, ultrasounds, stents, angioplasties) performed by Korban.*

48.    Despite working side-by-side with Dr. Korban, Relator is unaware of any actual independent review being conducted by an IRO and has never seen any of the contemplated reports issued, nor meetings conducted, as required in the IA.

49.    Further, even assuming that such reviews were technically being conducted in secret or outside Relator's presence, Relator is aware based upon his direct personal knowledge, that Dr. Korban has been and remains in direct violation of the terms of the agreement by virtue of his continuing fraud.

50.    As an employee/contractor of Dr. Korban, Relator should have received training pursuant to Section III B of the IA.  Dr. Korban arranged for Lynn Jones, his compliance officer to assist physicians receiving this training.  When Relator met with Ms. Jones to undergo the training and take the corresponding test, he was informed that "he shouldn't worry about it" and

that "I [Ms. Jones] would handle it."  As such, Relator did not actually receive the training contemplated by this section.  Rather, Ms. Jones used Relator's credentials to sign in to the system and answer the exam questions herself.  While perhaps minor in scale, this behavior further illustrates the brazen way in which Dr. Korban perceives requirements as mere suggestions, to be interpreted and disregarded as he sees fit.  Dr. Korban's disregard for the law is further evidenced by his record of false and misleading statements made to the public (as described in detail above) and resulting disciplinary action in Tennessee, Michigan, Illinois and Florida in the 2016-2018 timeframe.

## RHJ and DRMC WERE AWARE OF AND COMPLICIT IN KORBAN'S UNNECESSARY MEDICAL PROCEDURES AND FALSE BILLINGS

51.    RHJ and DRMC also knew, or recklessly disregarded or deliberately ignored, the tremendous volume of catheterizations Dr. Korban performed, even on weekends. Dr. Korban performed up to 18 catheterizations on Saturdays and up to 10 on Sundays.  These numbers alone (not even including the catheterizations done during the week) were excessive and would have raised a red flag about unnecessary procedures.

52.    Upon information and belief, medical staff committees at both DRMC and RHJ, including their respective medical executive committees, have been presented or confronted with reports of Dr. Korban's and Delta's overutilization and questionable billing practices.  Rather than legitimately investigate or stop these practices, the hospital Defendants disregarded them, allowed the fraud to persist and engaged in their own fraudulent billing of the facility portion for unnecessary procedures.

53.    Dr. Korban's abuses were obvious and blatant from the very start of his practice at these facilities.  Perhaps most stunningly, as described above, these very practices were at the center of a qui tam suit and related Department of Justice investigations which RHJ and Dr. Korban

resolved just a few years ago.

54.     Despite being under an IA and being made aware of the extensive unnecessary testing and procedures, neither RHJ nor DRMC took disciplinary actions against Dr. Korban or Delta.  To the contrary, DRMC actually named Dr. Korban as their Chief of Cardiology.  The unfortunate partnership between Dr. Korban, Delta and the Defendant Hospitals formed, and thrived, in furtherance of Defendants' mutual goal of defrauding the government.

### DEFENDANT HOSPITALS' FALSE BILLINGS TO MEDICAID AND MEDICARE

55.     Because of, and in connection with Dr. Korban's diagnosis and treatment of Medicare beneficiaries, those beneficiaries also received related services at Defendant Hospitals.

56.     Defendant Hospitals also participated in Medicare and accepted patients' assignment of Part A benefits for services provided in connection with Dr. Korban's and Delta's diagnoses and treatment.

57.     Defendant Hospitals presented or caused the presentment of those claims to Medicare Part A and were paid by Medicare Part A.

58.     Defendant Hospitals sought reimbursement, and actually received funds, from the Medicare and the Medicaid programs for providing inpatient and outpatient services and supplies to beneficiaries that were known to not be medically indicated or necessary.  These services were provided and claims were submitted solely to wrongfully maximize reimbursement from the federal payer programs, in disregard of patient well-being or finances of the American taxpayers.

59.     The process for requesting payment for services rendered to Medicare and Medicaid beneficiaries required the submission of individual claim forms by RHJ, DRMC and Dr. Korban or Delta for each patient with the appropriate diagnosis related group (DRG) for inpatient stays, the submission of a fee for service claim based on prevailing charges for inpatient and

outpatient services, and a representation that the services or supplies provided were medically necessary.

60.     The submission of Medicare and Medicaid claims by DRMC and RHJ involves a representation and certification by each Hospital that it would abide by and has abided by, and that it will adhere to and has adhered to all of the statues, rules and regulations governing the federal payer programs.

61.     RHJ and DRMC billed Medicare for services related to Dr. Korban and/or Delta's stent placements, heart diagnostics and treatments even though these services were neither medically indicated, nor necessary.  RHJ and DRMC falsely and fraudulently certified that the hospital services were medically indicated and necessary.

62.     RHJ and DRMC billed Medicare for services related to Dr. Korban's stent placements, heart diagnostics and treatments and other unnecessary medical procedures, even though these procedures, tests and stent placements were not medically indicated and were unnecessary.

63.     For each of the claims submitted by Dr. Korban, there was a corresponding false or fraudulent Medicare or TennCare claim presented by RHJ or DRMC for services related to the unnecessary cardiac procedure.  Those services were not medically indicated or necessary for the health of the patient.

64.     In each of these cases, the hospitals falsely or fraudulently certified that the hospital services were medically indicated and necessary for the health of the patient.  By hospitalizing patients for the purpose of performing cardiac procedures that were not medically indicated or necessary for the health of the patient, Dr. Korban and Delta caused the hospitals to present the false or fraudulent claims identified above.

## DEFENDANT HOSPITALS PAID ILLEGAL REMUNERATION TO DR. KORBAN

55.     RHJ, DRMC and Dr. Korban essentially engaged in a bilateral kickback arrangement.  Dr. Korban referred patients, admitted patients and performed unnecessary cardiac procedures in Defendant Hospitals.  Defendant Hospitals benefitted from these fraudulent actions by billing for hospital services.  More specifically, RHJ and DRMC:

    a) Paid Dr. Korban (vis-à-vis Delta) a significant salary subsidy above fair market value to offset Delta's payroll expenses,

    b) Ignored Dr. Korban's blatant overutilization of medical services,

    c) Continually granted Dr. Korban hospital privileges despite his fraud,

    d) Permitted Dr. Korban and Delta to bill and collect from Medicare and Medicaid for medically unnecessary cardiac procedures and;

    e) In the case of DRMC, promoted Dr. Korban to Chief of Cardiology.

56.     At all times during the relevant period and continuing to the present, DRMC, RHJ and CHS (through its ownership, individually, jointly, and/or in concert with one or more physicians) committed fraud by rewarding Dr. Korban for improperly admitting patients to their hospitals, many of whom did not meet medical necessity requirements for the procedures and/or admissions.

57.     RHJ and DRMC knew or should have known by virtue of their Utilization Review Committee of the Medical Staff, its Clinical Quality Improvement Department and other internal quality control mechanisms, that many of Dr. Korban's and Delta's procedures and admissions were not medically necessary.

58.     Relator lacks personal knowledge of any reports issued by the IRO pursuant to Dr. Korban's IA.  However, upon information and belief, Relator alleges that any valid IRO reports

would reveal the true nature of Dr. Korban's actions and the elements of his fraudulent scheme.

59.     RHJ and DRMC, through their administrators, ignored reports by medical staff members regarding Dr. Korban's scheme.  This includes, but is not limited to, reports made by the Relator, various cardiac catheterization lab personnel, various medical staff committees and the Utilization Review which informed them of Dr. Korban's overutilization of cardiac services. Instead, Defendant Hospitals chose to accept substantial, but yet illegally obtained, remuneration from the federal payer programs while ignoring Korban's fraudulent actions.  Defendant Hospitals not only tolerated the fraud but encouraged it by promoting Dr. Korban and granting him generous salary subsidies.  This scheme violates 42 U.S.C. § 1320a-7(b)(b)(l)(2) and (3), the Anti-kickback Statute, and as such, actionable under the False Claims Act.

60.     As a condition of participation in the Medicare Program and as a condition precedent to the receipt of Medicare reimbursements, RHJ and DRMC must complete annual Medicare Cost Reports on Centers for Medicare and Medicaid Services (CMS) Form 2552.  These reports contain representations and certifications by an officer that he or she is "familiar with the laws and regulations regarding the provision of healthcare services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

61.     The cost reports would describe services to Dr. Korban's patients, for which the Hospitals received kickbacks or illegal inducements (through the hospitals' willful blindness to Dr. Korban's activities and unlawful excessive compensation to Dr. Korban) prohibited by 42 U.S.C. § 1320a-7b(b) and 42 U.S.C. § 1395nn and/or other laws.  Thus, the CMS Cost Reports are "false records or statements" for purposes of the False Claims Act, 31 U.S.C. §§ 3729-3733.

62.     Specifically, the statements contained in the cost reports that "the services identified in this cost report were provided in compliance with such laws and regulations" and

"were medically necessary" are false and thus violate the False Claims Act, 31 U.S.C. §§ 3729-3733.

63.     Prohibited claims were submitted and paid by the government to RHJ, DRMC, Dr. Korban and Delta.  All parties knew the quid pro quo for Dr. Korban's ongoing referral of patients to the hospitals' catheterization facilities was a combination of the salary subsidies and refusal to enforce quality assurance measures as to Dr. Korban's patient selection and the unnecessary procedures he performed.

64.     Dr. Korban conspired with RHJ to submit and cause to be submitted false claims for reimbursement to both Medicaid and Medicare on behalf of both Dr. Korban and RHJ, as described above.

65.     Defendant Korban conspired with DRMC to submit and cause to be submitted false claims for reimbursement to both Medicaid and Medicare on behalf of both Dr. Korban and DRMC, as described above.

## SPECIFIC PATIENT EXAMPLES

66.     Collectively, the Defendants herein perpetrated their scheme by misrepresenting eligibility criteria for interventional cardiology procedures, which mirrors the tactics that gave rise to the prior complaint filed by Dr. Demming some ten years ago.  There are no unique new details or dramatic twists to the aforementioned scheme, which was previously investigated and seemingly resolved.  Rather, Dr. Korban is simply up to his old tricks and the other Defendants are perfectly happy to share in the ill-gotten gains so long as he keeps their operating rooms and cath labs full.

67.     Dr. Korban and Delta have continually overstated the severity of stenosis in patients whom they have diagnosed, misrepresented the cardiac symptoms that are present and

misrepresented stress test results.  This was done so as to increase the amount of percutaneous coronary interventions (PCIs) performed and therefore increase the amount of billing to federal government health care programs.

68.    Dr. Korban and Delta have also overutilized cardiology testing procedures.  This was not done to assure the best health care is delivered, but to assure their pockets are lined with the reimbursements from government health care programs.

A.  **Unnecessary Angioplasty and Stenting**

69.    According to a review of randomized controlled trials that was published by Dr. David L. Brown on February 27, 2012, the common practice of inserting a stent to repair a narrowed artery (known as percutaneous coronary intervention (PCI)), has no benefit over standard medical care in treating stable coronary artery disease.  Not only is the procedure costly (it varies from $30,000 to $50,000), it also has numerous risks.  Those risks include stroke, heart attack, bleeding, kidney damage and allergic reactions.  Gravely, the risk of death is one in one thousand.

70.    According to Dr. Brown, "[m]oney is the driving force" because "[e]verybody gets paid to put in stents, the hospital gets paid, the doctor gets paid, the stenting company gets paid," and he believes the fee-for-service environment has taken over the decision making in cardiology. Dr. Brown further reported that "[i]n many hospitals, the cardiac service line generates 40 percent of the total hospital revenue, so there's incredible pressure to do more procedures."

71.    Defendants herein could be poster children for Dr. Brown's study and corresponding conclusions as they have been motivated to perform PCI's based strictly on the reason Dr. Brown identifies, money and greed!

72.    Soon after Realtor started working for Dr. Korban, he noticed that a disproportionately large amount of cardiac invasive and interventional procedures were being

performed each day.  In reviewing the charts and records, Relator observed that a large number of those procedures were unnecessary.  However, Defendants, including the management of DRMC and RHJ, turned a blind eye in favor of financial gains.

73.     The current Guidelines for Coronary Intervention clearly state that patients undergoing coronary interventions need to have coronary blockage of at least 70% in order to place a stent in the fair-sized vessel.

74.     Relator has personally observed numerous government insured patients who have received angioplasty and/or stents from Dr. Korban and Delta whose actual blockage was significantly less than 70To create false support to enable the scheme, the reported blockage was exaggerated by Dr. Korban and/or Delta, thereby justifying  the placement of stents.

75.     The fraud which is alleged herein clearly preceded Relator's employment with Dr. Korban and continues through the date of submission of this complaint.  Moreover, both CHS/Tennova hospitals (RHJ and DRMC) are active participants in the fraud.  Relator provides the following patient encounters as representative examples of the extensive and endemic fraud.

**Medicare Patient V.A.**

76.     Patient V.A. was treated by Dr. Korban on March 28, 2016.  A review of the patient's medical record shows that Dr. Korban reported "OM1 has a 50% in-stent stenosis" and that the obtuse marginal artery underwent intravascular ultrasound (IVUS) revealing a "70%" stenosis. (Redacted Medical Record of Patient V.A. is attached hereto has **Exhibit 1**.)

77.     Physiologic assessment of the obtuse marginal artery with Fractional Flow Reserve was not performed.  Dr. Korban performed angioplasty to the obtuse marginal artery, and angioplasty to the non-dominant right coronary artery.  According to accepted standards of care, stenting a coronary lesion which is less than 70% is inappropriate and stenting of an "intermediate

appearance" (50-70% lesion) coronary stenosis without first performing a physiologic assessment with Fractional Flow Reserve is inappropriate.

78.     Stenting of a non-dominant right coronary artery, especially without a stress test documenting ischemia to that zone, which this patient unequivocally did not receive, is inappropriate.  Dr. Korban deviated from the standard of medical care in performing unnecessary angioplasty to both the obtuse marginal branch and the non-dominant right coronary artery during his treatment of Patient V.A.

79.     Medicare was subsequently billed for these procedures and paid for the unnecessary treatment, which also carried an inherent risk of complication from the unnecessary surgery.  Dr. Korban performed these unnecessary procedures in order to enrich himself and Defendant Regional Hospital of Jackson.

**Medicare Patient L.W.**

55.     Patient L.W. was treated by Dr. Korban on April 25, 2016 and April 27, 2016.  A review of this patient's medical record shows that Dr. Korban reported on April 25, 2016, that the saphenous vein graft was patent to the native right coronary artery, and that the native right coronary artery had a 70% mid-stenosis.  On April 27, 2016, Dr. Korban performed angioplasty and stenting to the native right coronary artery, placing one stent to the mid-right coronary artery, and one stent to the ostium of the right coronary artery. (Redacted Medical Record of Patient L.W. is attached hereto has **Exhibit 2**.)

56.     Stenting a native coronary artery, when a surgical graft is patent to the same vessel is unnecessary and is a breach of the standard of medical care.  Placing a stent to a coronary lesion less than 70% is also a breach of the standard of medical care.  The stent placed to the mid right coronary artery was inappropriate as the surgical graft was patent, and the stent to the ostium of

the right coronary artery was inappropriate as there was not a stenosis in that area, and the surgical graft was patent.

57.     Medicare was subsequently billed for these procedures and paid for unnecessary treatment, which also carried an inherent risk of complication from the unnecessary surgery. Dr. Korban performed these unnecessary procedures in order to enrich himself and Defendant Dyersburg Regional Medical Center.

**Medicare Patient D.A.**

80.     Patient D.A. was treated by Dr. Korban on August 25, 2016 and August 29, 2016. A review of the patient's medical record shows that Dr. Korban, in reviewing the angiogram completed on August 25, 2016, reported that the surgical graft to the left anterior descending artery was patent and that the native right coronary artery had a "70-80% mid stenosis" while, in actuality, the mid right coronary artery only had a 30-40% stenosis. (Redacted Medical Record of Patient D.A. is attached hereto has **Exhibit 3**.)

58.     On August 29, 2016, Dr. Korban performed angioplasty and placed a stent to the mid right coronary artery and a stent to the left main coronary artery.  Stenting a coronary lesion which is less than 70% is inappropriate and unnecessary.  Stenting a native coronary artery that has a patent surgical graft is also inappropriate and unnecessary.  The mid right coronary artery received a stent to an area that was not at least 70% stenotic and was therefore inappropriate and the left main coronary artery received a stent even though both the left internal mammary artery graft to the left anterior descending artery was patent, and the saphenous venous graft to the obtuse marginal branch of the circumflex artery was patent, and was also inappropriate. Additionally, shortness of breath and a reduced ejection fraction, which Dr. Korban noted in the medical record, are not appropriate indications for coronary angioplasty.

59.     Medicare was subsequently billed for these procedures and paid for unnecessary treatment, which also carried an inherent risk of complication from the unnecessary surgery.  Dr. Korban performed these unnecessary procedures in order to enrich himself and Defendant Regional Hospital of Jackson.

**Medicare Patient T.T.**

81.     Patient T.T. was treated by Dr. Korban on October 14, 2016.  A review of this patient's medical record shows that Dr. Korban reported that an angiogram performed on that day revealed a "50% in-stent restenosis," yet on that very same day Dr. Korban performed angioplasty to the circumflex artery even though the stenosis was less than 70%.  Performing angioplasty to a coronary lesion with less than 70% is a breach of the standard of medical care and is inappropriate and unnecessary. (Redacted Medical Record of Patient T.T. is attached hereto has **Exhibit 4**.)

60.     Medicare was subsequently billed for this test and procedure and paid for unnecessary treatment, which also carried an inherent risk of complication from the unnecessary surgery.  Dr. Korban performed this unnecessary procedure in order to enrich himself and Defendant Regional Hospital of Jackson.

**Medicare Patient R.R.**

82.     Patient  R.R. was treated by Dr. Korban on November 21, 2016.  A review of the patient's medical record shows that Dr. Korban reported that an angiogram performed on that day showed "50% haziness in the proximal and mid" of the left anterior descending artery (LAD) while, in fact, the left anterior descending artery had approximately a 20% mid stenosis. Additionally, the record showed that an angiogram performed on September 22, 2016, showed that the surgical graft to the left anterior descending artery was patent. Dr. Korban performed angioplasty and placed a stent to the mid left anterior descending artery on November 21, 2016.

Stenting a coronary lesion which is less than 70% is inappropriate and unnecessary. Stenting a native coronary artery that has a patent surgical graft is also inappropriate and unnecessary. (Redacted Medical Record of Patient R.R. is attached hereto has **Exhibit 5**.)

61.    Medicare was subsequently billed for this test and procedure and paid for unnecessary treatment, which also carried an inherent risk of complication from the unnecessary surgery.   Dr. Korban performed this unnecessary procedure in order to enrich himself and Defendant Dyersburg Regional Medical Center.

62.    These five patient encounters serve as representative examples of the broader unlawful conduct of Defendants, whose actual overbilling to Medicare for inappropriate and unnecessary procedures totals in the multi-millions based on the amount of procedures that have been performed, and continue to be performed, by Defendants.

**B.    Unnecessary Cardiology Testing**

63.    In order to identify as many patients as possible for unnecessary procedures, Defendants engaged in a pattern and practice of unnecessary and excessive cardiology testing.

64.    Dr. Korban's clinics have Coronary Computed Tomography Angiogram (CCTA) machines, CT scanners, nuclear stress testing labs, and Calcium scoring machines, among others.

65.    Unnecessary duplicate tests are performed on these machines strictly for financial gain.  Many of the testing machines are of such poor quality or rely upon outdated technology that patients who have received the tests have to be retested whenever they are hospitalized.

66.    One machine, an Acuson cardiac ultrasound machine, is over 10 years old and does not provide the level of detail that newer technology can provide.  Two SonoSite cardiac ultrasound machines regularly provide results that are inconclusive due to malfunctioning probes.

67.    Beyond the shoddy, malfunctioning and outdated equipment, Dr. Korban and Delta

regularly engage in testing which is not indicated.

68.     The following patient encounters serve as representative examples of the broader unlawful conduct of Defendants, whose actual overbilling to Medicare for inappropriate and unnecessary testing totals in the multi-millions based on the number of tests that have been performed, and continue to be performed, by Defendants.

**Medicare Patient G.C.**

83.     Patient G.C. was subjected to several cardiology testing procedures that were conducted at Dr. Korban's clinic.  A review of the patient's medical record shows that on May 24, 2016, he was subjected to a nuclear stress test which was interpreted as normal and without coronary ischemia.  On September 6, 2016, a coronary CT angiogram was performed. (Redacted Medical Record of Patient G.C. is attached hereto has **Exhibit 6**.)

69.     Dr. Korban interpreted the test and stated "recommendation: based on CTA findings, left heart catheterization is recommended."  On September 9, 2016, a coronary angiogram was performed by Defendant Korban with the indication for the procedure identified by Dr. Korban as "angina equivalent CTA of the coronaries."

70.     The angiogram was also listed as part of an invasive cardiac evaluation prior to a lung biopsy.  There is no such entity as "angina equivalent CTA" and a normal stress test, as was indicated on May 24, 2016, defines low cardiac risk for a lung biopsy and eliminates the need for a coronary angiogram.  A coronary CT angiogram, especially in the setting of a normal stress test, should not be used to substantiate a coronary angiogram.

71.     Dr. Korban ordered an unnecessary and inappropriate coronary angiogram for patient GC which was billed to, and paid for, by Medicare. Dr. Korban ordered the unnecessary testing strictly to enrich himself.

**Medicare Patient H.M.**

84.    Patient H.M. was subjected to several cardiology testing procedures that were conducted at Dr. Korban's clinic.  A review of the patient's medical record shows that on May 10, 2016, they underwent a coronary CT angiogram that was interpreted by Dr. Korban as normal. (Redacted Medical Record of Patient H.M. is attached hereto has **Exhibit 7**.)

72.    On August 29, 2016, the patient underwent a nuclear stress test which was also interpreted as normal.  The stress test was performed as part of an evaluation of chest discomfort, which was then determined to be "non-cardiac."  On September 19, 2016, a repeat coronary CT angiogram was performed on Patient HM after it was ordered by Ms. Cara Roberson, a nurse employee of Dr. Korban.  The indication for the study was "elevated coronary calcium score."  Dr. Korban interpreted the study and then made a recommendation for "left heart catheterization."

73.    On October 6, 2016, Dr. Korban performed coronary angiography and coronary angioplasty on the patient.  Dr. Korban dictated that he knew the stress test was normal but performed the procedure because "CTA of the coronaries revealed significant coronary artery disease, hence cardiac Cath was warranted." (sic.)

74.    Coronary angioplasty is not appropriate based upon a coronary CT angiogram result, especially in the setting of a normal nuclear stress test as was indicated on August 29, 2016. Ischemia needed to be documented in the territory of the left anterior descending artery, where Dr. Korban placed the stent, as well as maximal medical management with dual anti-anginal medication treatment needing to fail prior to coronary angioplasty and stent placement.

75.    Dr. Korban performed unnecessary testing and unnecessary angioplasty and stent placement on this patient, which was billed to, and paid for, by Medicare. The unnecessary testing and cardiology procedures were performed strictly to enrich Defendants.

**Medicare Patient C.H.**

85.     This patient was subjected to several cardiology testing procedures that were conducted at Dr. Korban's clinic.  A review of the patient's medical record shows that a nuclear stress test was performed on him on July 22, 2016.  The test was performed because of syncope (loss of consciousness) and not because of angina.  The test was interpreted as normal and without coronary ischemia. (Redacted Medical Record of Patient C.H. is attached hereto has **Exhibit 8**.)

76.     A coronary CT angiogram was ordered and performed On September 14, 2016 with an indication of "elevated coronary calcium score."  The test was interpreted by Dr. Korban and a "recommendation: Based on CTA findings, recommend left heart catheterization" was made.  Coronary angiography is not indicated in the setting of a normal nuclear stress test and absence of angina.  An elevated coronary calcium score and abnormal coronary CT angiogram does not provide an acceptable indication for coronary angiogram.

77.     Dr. Korban ordered unnecessary testing and made an inappropriate recommendation to perform coronary angiography which was billed to, and paid for, by Medicare.  The unnecessary testing was performed strictly to enrich Dr. Korban.

**Medicare Patient E.W.**

86.     This patient was subjected to several cardiology testing procedures that were conducted at Dr. Korban's clinic.  A review of the patient's medical record shows that she underwent a coronary CT angiogram on August 11, 2016 which was ordered by Dr. Okewole, an employee of Dr. Korban and Delta.  Dr. Korban interpreted the test as showing "mild disease."  On August 23, 2016, patient EW underwent a coronary calcium CT scan which was ordered by Ms. Roberson, a nurse employee of Dr. Korban.  The coronary calcium CT scan was inappropriate and unnecessary as the patient had a coronary CT angiogram performed less than two weeks prior.

The unnecessary and inappropriate calcium CT scan was billed to, and paid for, by Medicare. This unnecessary testing was performed strictly to enrich Dr. Korban. (Redacted Medical Record of Patient E.W. is attached hereto has **Exhibit 9**.)

78.     The amount of unnecessary and inappropriate testing conducted by Defendants has caused Medicare to pay tests which should never have been ordered, nor paid for. Further, while the results of said unnecessary tests should have been used to rule out additional interventions, they were instead overlooked or misinterpreted in order to bilk the government for unnecessary procedures.

## IV.        The False Claims Act

79.     The FCA, as amended, provide in pertinent part that:

"[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person." - U.S.C. § 3729(a)(1)

80.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

81.     No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## V.        Government Insurance Programs

82.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42

U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  See 42 U.S.C. §§ 426, 426-1.

83.   Medicare only pays for services that are reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. 42 U.S.C. § 1395y(a)(l)(A).  In presenting claims for payment to Medicare, physicians and hospitals certify that the claims accurately describe the services rendered and that the services were medically indicated and necessary for the health of the patient.

84.   Medicaid is a joint federal-state program in which the United States provides a significant share of funding.  The Medicaid program in Tennessee - known as TennCare - pays for hospital and physician services for indigent individuals.  CMS administers Medicaid on the federal level.  Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels, and administrative and operation procedures.

85.   TennCare pays healthcare providers directly, with Tennessee obtaining the federal share of the payment from accounts that draw on funds from the United States Treasury. 42 C.F.R. §§ 430.0-430.30.  Although the federal share of TennCare funding may vary from year to year, the federal medical assistance percentage (FMAP) for TennCare during the relevant time period was 65.05 percent.

86.   Like CMS, TennCare only pays for services that are medically necessary.  T.C.A. § 71-5-144.  To qualify as medically necessary under TennCare, a medical item or service must be required in order to diagnose or treat the medical condition, must be safe and effective and must be the least costly alternative course of diagnosis or treatment that is adequate for the medical condition.

87.     In presenting claims for payment to TennCare, physicians and hospitals certify that the claims accurately describe the services rendered and that the services were medically indicated and necessary for the health of the patient.

88.     When diagnostic, interventional cardiology, angioplasty or other cardiology services are provided to Medicaid or Medicare patients in a hospital, the physician bills for his or her professional services and the hospital bills for services including the bed, nursing care, use of the operating room or catheterization lab and supplies, and other institutional charges.

89.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

90.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395(u).  In this capacity, the fiscal intermediaries act on behalf of CMS.  42 C.F.R. § 413.64.  Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers.  Those claims are paid with federal funds.

91.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, home health care and hospice. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5.  The allegations herein involve both Parts A and B for services billed by the Defendants to Medicare.

92.     In order to get paid, a provider completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 or also known as a CMS-1450 form.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the UB-4/CMS-1450 to determine whether and what amounts the hospice provider is owed.

93.     A key purpose of the UB-04/CMS-1450 is to protect the federal government from loss due to mistake or fraud.  Medicare has the right to audit all provider claims and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  However, while provider claims are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of claims submitted to them. For these reasons, the Medicare billing system relies substantially on the good faith of providers to prepare and file accurate claims.

94.     To this end, the UB-04/CMS-1450 form contains the following warning:

> THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL AND MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).  SUBMISSION OF THIS CLAIM CONSTITUTES CERTIFICATION THAT THE BILLING INFORMATION AS SHOWN ON THE FACE HEREOF IS TRUE, ACCURATE AND COMPLETE.  THAT THE SUBMITTER DID NOT KNOWINGLY OR RECKLESSLY DISREGARD OR MISREPRESENT OR CONCEAL MATERIAL FACTS.

95.     In order to get paid from Medicare, providers, like Defendants herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS-1450.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the

Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the CMS-1450 to determine whether and what amounts the provider is owed.

96.     That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

97.     To this end, the Health Insurance Claim Form, CMS 1450, contains the following certification by the physician or supplier submitting a claim to Medicare:

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

98.     That certification is then followed by the following "Notice:"

Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## **Conditions of Participation and Conditions of Payment**

99.     To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

100. One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

101. Various claims forms, including the Health Insurance Claim Form, require that the provider certify that the medical care or service rendered was medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records. *Id.* See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

102. The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

### Obligation to Refund Overpayments

103. As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement.  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

104. Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. §

1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg.

## CAUSES OF ACTION

### Count I
### Submission of False Claims
### 31 U.S.C. § 3729(a)(1)(A))

105.    Relator alleges and incorporates by reference paragraphs 1–136 of this Amended Complaint as though fully set forth herein.

106.    Through the acts described above, Defendants and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and are still presenting or causing to be presented, to the United States government and state governments participating in the Medicare and Medicaid, and other government sponsored insurance programs, false and fraudulent claims, records, and statements in order to obtain reimbursement for healthcare services that were falsely billed and/or not medically necessary, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. §3729 (a)(1)(A).

107.    As a result of Defendants' actions, as set forth above, the United States of America relied upon the statements and records submitted by Defendants and has been, and continues to be, severely damaged.

108.    By virtue of Defendants' conduct, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

### Count II
### Making False Record
### 31 U.S.C. § 3729(a)(1)(B))

109.   Relator alleges and incorporates by reference paragraphs 1–136 of this Amended Complaint as though fully set forth herein.

110.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

111.   In addition to the creation of false medical records and the submission of false invoices as described above, Defendant Korban has specifically falsely certified compliance with his Integrity Agreement all while knowing he was in violation of its express terms.  Defendants CHS, Tennova, RHJ and DRMC have knowingly falsely certified compliance with the laws and rules regulating Medicare.

112.   As a result of Defendants' actions, as set forth above, the United States of America and the state governments participating in the Medicare and Medicaid, and other government sponsored insurance programs have been, and may continue to be, severely damaged.

113.   By virtue of Defendants' conduct, the United States and listed States suffered damages and therefore are entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

### Count III
### Reverse False Claims
### 31 U.S.C. § 3729(a)(1)(G))

114.   Relator alleges and incorporates by reference paragraphs 1–136 of this Amended Complaint as though fully set forth herein.

115.     Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records and statements material to obligations to pay or transmit money to the government, or knowingly concealed, improperly avoided or decreased their obligation to pay money to the United States government that they improperly or fraudulently received.

116.     Defendants also failed to disclose to the government material facts that would have resulted in substantial repayments by them to the federal and state governments in violation of 31 U.S.C. § 3729(a)(1)(G).

117.     Defendants, at all relevant times to this action, had an ongoing legal obligation to report and disclose overpayments to the government pursuant to 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C, 42 C.F.R. §§ 489.40, 489.31, 42 U.S.C. § 1320a-7b(a)(3), 42 U.S.C. § 1395u; and 42 C.F.R. § 489.20(g), and failed to do so.

118.     As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.  By virtue of Defendants' conduct, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

### Count IV
### Conspiracy to Submit False Claims
### 31 U.S.C. § 3729(a)(1)(C)

119.     Plaintiff alleges and incorporates by reference paragraphs 1–136 of this Amended Complaint as though fully set forth herein.

120.     Defendants entered into agreements in order to conspire to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States, acting

through its programs, Medicare, Medicaid, and other government sponsored insurance programs, for money to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3) (2006) and 31 U.S.C. § 3729(a)(1)(C) (2012).

121.    Acting in concert, Defendant Korban and his practice group Delta, worked in conjunction with Defendants CHS' and Tennova's hospitals DRMC and RHJ to submit false or fraudulent claims for cardiac procedures and evaluations which were not medically necessary. Salary subsidy agreements and payments between the Defendants cemented their participation in this cabal.

122.    By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**WHEREFORE**, Relator demands judgment against all Defendants as follows:

A. That this Court order Defendants to cease and desist from violating 31 U.S.C. §3729 *et seq.* and the equivalent provisions of the state statutes set forth above.

B. That this Court declare that Defendant Dr. Korban is in violation of the terms of his Integrity Agreement.

C. That this Court enter judgment against each Defendant in an amount equal to three times the amount of damages the United States government has sustained because of each Defendant's actions, plus a civil penalty of $11,000 for each false claim, together with the costs of this action, with interest, including the cost to the United States government for its expenses related to this action.

D. That this Court enter judgment against Defendants for the maximum amount of actual damages under 31 U.S.C. §3729 *et seq.*

E. That Plaintiff/Relator be awarded all costs incurred, including his attorneys' fees.

F. That in the event the United States intervenes in this action, Plaintiff/Relator be awarded 25% of any proceeds of the claim, and that in the event the United States government does not intervene in this action, Relator be awarded 30% of any proceeds.

G. That the United States and Plaintiff/Relator receive all relief, both in law and in equity, to which they are entitled.

Plaintiff/Relator requests a trial by jury.

Respectfully submitted this 24th day of July, 2019.

*/s/ James D. Young*

By: _____

James D. Young (Fla. Bar No. 567507)
jyoung@forthepeople.com
*(pro hac vice)*
Shelby Serig (Fla. Bar No. 721581)
sserig@forthepeople.com
*(pro hac vice to be filed)*
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura Street, 11th Floor
Jacksonville, Florida 32202
Tel: (904) 361-0012  Fax (904) 361-4307

Kathryn Barnett (TN No. 15361)
kbarnett@forthepeople.com
Jason Gichner (TN No. )
jgichner@forthepeople.com
MORGAN & MORGAN
810 Broadway, Suite 105
Nashville, Tennessee 37203
Tel:  (615) 490-0944

W. Bryan Smith (TN No. 18230)
MORGAN & MORGAN MEMPHIS, LLC
One Commerce Square, Suite 2600
Memphis, Tennessee 38103
Tel: (901) 217-7000
Fax:  (901) 333-1897
Email:  bryans@forthepeople.com

*Attorneys for Plaintiff/Relator*