# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. GURPREET MAUR, M.D., <br><br>Plaintiff, <br><br>v. <br><br>ELIE HAGE-KORBAN, M.D., DELTA CLINICS, PLC d/b/a THE HEART and VASCULAR CENTER OF WEST TENNESSEE, COMMUNITY HEALTH SYSTEMS, INC., KNOXVILLE HOLDINGS, LLC d/b/a TENNOVA HEALTHCARE, JACKSON HOSPITAL CORPORATION d/b/a REGIONAL HOSPITAL OF JACKSON, and DYERSBURG HOSPITAL COMPANY, LLC, d/b/a DYERSBURG REGIONAL MEDICAL CENTER, <br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:17-cv-01079-STA-jay |

## ORDER GRANTING MOTIONS TO DISMISS

Before the Court are three Motions to Dismiss, all filed on September 30, 2019. Defendants Dyersburg Hospital Company, LLC ("Dyersburg Hospital"), Jackson Hospital Corporation ("Jackson Hospital"), and Knoxville HMA Holdings, LLC, d/b/a Tennova Healthcare ("Tennova") filed a Motion to Dismiss for Failure to State a Claim and a Memorandum of Law in Support. (ECF Nos. 50, 51.) Defendant Community Health Systems, Inc. ("CHS") filed a separate Motion to Dismiss for Failure to State a Claim. (ECF No. 52.) Finally, Defendants Delta Clinics, PLC ("Delta") and Elie Hage-Korban ("Korban") filed a Motion to Dismiss for Failure to State a Claim and Memorandum in Support. (ECF Nos. 54, 55.) Relator Gurpreet Maur filed Reponses in

Opposition to each Motion on October 28, 2019. (ECF Nos. 57–59.) On November 11, 2019, each respective Defendant or group of Defendants filed a Reply. (ECF Nos. 60–62.) For the reasons discussed below, Defendants' Motions are **GRANTED** and the above-entitled action is **DISMISSED**.

## BACKGROUND

### I. 2007 Lawsuit

In 2007, Dr. Wood M. Deming filed a *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729–33, against Jackson-Madison County General Hospital, Regional Hospital of Jackson, and Dr. Elie Hage Korban, among others, alleging that the Defendants "engaged in a bilateral kickback and self-referral scheme" wherein hospital leadership "chose to ignore blatant overutilization of cardiac medical services . . . by Korban, shielding same from any scrutiny by the hospitals' clinical quality improvement mechanisms" resulting in fraudulent claims being submitted to and paid by federal payer programs, such as Medicare, TriCare, and Medicaid. (Complaint at 2, *United States ex rel. Deming v. Jackson-Madison Cnty. Gen. Hosp.*, No. 1:07-cv-01116-SHL-egb (W.D. Tenn. June 13, 2007), ECF No. 54-2.) That action concerned cardiac procedures that occurred between January 1, 2005, and December 31, 2008. The United States intervened in the action and ultimately settled the case.

In 2013, pursuant to his settlement, Korban agreed to pay $1,150,000 and entered into an Integrity Agreement ("IA") with the United States Department of Health and Human Services Office of Inspector General.[1] (ECF No. 54-4.) The IA, in effect from November 13, 2013, to November 13, 2016, required Korban to engage an Independent Review Organization to "evaluate

---

[1] In 2015, the United States reached a settlement agreement with Jackson-Madison County General Hospital and Regional Hospital of Jackson wherein they agreed to pay $1,328,465 and $510,000, respectively.

and analyze the medical necessity and appropriateness of interventional cardiac procedures performed by Korban" as well as "conduct a review of Korban's coding, billing, and claims submission to the Federal health care programs and the reimbursement received for procedures performed by Korban" every three months. (*Id.* at p. 4.) Under the IA, the Office of Counsel to the Inspector General retained ultimate supervisory authority over Korban's medical practice. The Department of Justice issued a press release on December 19, 2013, that detailed the fraudulent scheme and the terms of Korban's settlement.[2]

## II. Allegations in the Amended Complaint

On April 25, 2017, Plaintiff filed this lawsuit alleging that Defendants violated the False Claims Act when they billed government insurance for unnecessary cardiac procedures and testing.[3] (ECF No. 1.) Plaintiff filed an Amended Complaint on July 24, 2019. (ECF No. 25.) Plaintiff alleges that during his employment at Delta Clinics with Korban, Korban did not comply with the IA. Plaintiff acknowledges the prior fraud but alleges that despite the aforementioned legal action, the above-described fraudulent activities persist. (*Id.* at p. 11–18.) Plaintiff cites five specific patients on whom Korban allegedly performed unnecessary angioplasties and stenting: V.A. on March 28, 2016; L.W. on April 27, 2016; D.A. on August 29, 2016; T.T. on October 14, 2016; and R.R. on November 21, 2016. (*Id.* at p. 19–24.) Plaintiff then cites to four additional patients on whom Korban performed unnecessary cardiology testing: G.C. on May 24, 2016; September 6, 2016; and September 9, 2016; H.M. on August 29, 2016, September 19, 2016, and

---

[2] Press Release, Office of Pub. Affairs, Dep't of Justice, Tennessee Cardiologist to Pay $1.5 Million to Settle Allegations That He Performed Medically Unnecessary Heart Procedures, https://www.justice.gov/opa/pr/tennessee-cardiologist-pay-115-million-settle-allegations-he-performed-medically-unnecessary.

[3] On April 29, 2019, the United States of America declined to intervene in this action.

3

October 6, 2016; C.H. on July 22, 2016, and September 14, 2016; and E.W. on August 11, 2016, and August 23, 2016. (*Id.* at p. 24–28.)

In Count I, Plaintiff alleges that Defendants submitted false claims to Medicare for each inappropriate and unnecessary procedure and test, in violation of 31 U.S.C. § 3729(a)(1)(A). In Count II, Plaintiff alleges all Defendants made false records material to the payment of the false claims and that Defendant Korban "specifically falsely certified compliance with his Integrity Agreement all while knowing he was in violation of its express terms," in violation of 31 U.S.C. § 3729(a)(1)(B). In Count III, Plaintiff alleges Defendants failed to report and disclose material facts that would have required them to make substantial repayments to the federal and state governments, in violation of 31 U.S.C. § 3729(a)(1)(G). Finally, in Count IV, Plaintiff alleges Defendants conspired to submit false claims, whereby "[s]alary subsidy agreements and payments between the Defendants cemented their participation in this cabal," in violation of 31 U.S.C. § 3729(a)(1)(C).

## STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). A complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*,

550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. Accordingly, a "complaint must contain either direct or inferential allegations with respect to all material elements of the claim." *Wittstock v. Mark A. Van Sile, Inc.,* 330 F.3d 899, 902 (6th Cir.2003).

A complaint alleging fraud must also satisfy the heightened particularity standard, which requires the who, what, when, where, and how of the alleged fraud. Fed. R. Civ. Pro. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404, 406 (6th Cir. 2018) (citing *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). "In cases involving multiple defendants, allegations under Rule 9(b) must include specific facts as to each defendant; 'general averments of fraud attributed to the defendants' do not suffice." *Orlowski v. Bates*, No. 2:11–cv–01396–JPM–cgc, 2015 WL 1485980, at *6 (W.D. Tenn. Mar. 31, 2015) (quoting *Hoover v. Langston Equip. Assoc., Inc.,* 958 F.2d 742, 745 (6th Cir.1992)).

ANALYSIS

Defendants seek dismissal of Relator Maur's claims on two distinct grounds. Defendants Tennova, Jackson Hospital, and Dyersburg Hospital and Defendants Korban and Delta argue in their separate Motions that because the allegations in this action are substantially the same as the allegations in *Deming*, a Department of Justice press release, and a Regional Hospital of Jackson press release, this action is barred by the public disclosure bar, 31 U.S.C. § 3730(e)(4). Defendant

5

CHS argues—and Defendants Tennova, Jackson Hospital, and Dyersburg Hospital argue in the alternative—that Plaintiff failed to plead each count with plausibility and particularity, as required by Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure.

## I.  Public Disclosure Bar

"The False Claims Act (FCA), 31 U.S.C. §§ 3729–3733, prohibits submitting false or fraudulent claims for payment to the United States, § 3729(a), and authorizes *qui tam* actions,[4] in which private parties bring civil actions in the Government's name, § 3730(b)(1)." *Schindler Elevator Corp. v. Kirk*, 563 U.S. 401, 404 (2011).

> If a relator is successful in recovering money for the government, she may retain up to twenty-five percent of the proceeds, as well as reasonable expenses, attorney's fees, and costs. 31 U.S.C. § 3730(d)(1). However, Congress was aware that the qui tam provision could encourage "opportunistic plaintiffs" to bring "parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud." In an effort to stop such "opportunistic suits, on the one hand, and encourage citizens to act as whistleblowers, on the other," Congress placed a number of limitations on qui tam actions under the FCA, among which is the public-disclosure bar . . . .

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 433 (6th Cir. 2016) (internal citations omitted).  The FCA's public disclosure bar provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
> **(i)** in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> **(ii)** in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> **(iii)** from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

---

[4] "The phrase '*qui tam*' is short for *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* meaning 'who [*qui* ] sues in this matter for the king as well as [*tam* ] for himself.'" *United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016).

The Sixth Circuit has articulated a three-step analysis to determine whether public disclosure bars a *qui tam* action under the Federal Claims Act. *United States ex rel. Armes v. Garman*, 719 F. App'x 459 (6th Cir. 2017). First, the Court must determine "whether there has been a public disclosure of fraud." *Id.* at 463 (citing *United States ex rel. Poteet v. Medtronic, Inc.*, 522 F.3d 503, 511 (6th Cir. 2009)). If so, the Court must see whether the *qui tam* complaint contains allegations that are "substantially the same" as the publicly disclosed allegations. *Id.* Finally, if the aforementioned conditions have been met, the Court must determine whether the relator is an "original source" so that the action may proceed despite the public disclosure. *Id.*

### A. *Public Disclosure*

This Court finds that the fraudulent conduct alleged in the Amended Complaint was publicly disclosed. "There has been a public disclosure when 'enough information exists in the public domain to expose the fraudulent transaction' and to 'put the government on notice of the likelihood of related fraudulent activity.'" *Id.* (quoting *United States ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 615–16 (6th Cir. 2015)) (internal quotation marks and citations omitted). "Court filings in cases where the government or its agent is a party constitute a public disclosure." *Id.* Relator does not dispute that the fraudulent scheme was publicly disclosed and even acknowledges as much in his Amended Complaint when discussing the *Deming qui tam* action. (Am. Complt. ¶¶ 38–50, ECF No. 25.) Consequently, this Court finds that the *Deming qui tam* action, the Department of Justice press release, and the Regional Hospital of Jackson press release constitute public disclosures of the alleged fraudulent scheme.

*B. "Substantially the same allegations or transactions"*

This Court finds that the allegations in the instant action are "substantially the same" as those publicly disclosed in the *Deming* action.[5] "There need not be a complete identity 'even as to time, place, and manner' between the publicly disclosed allegations or transactions and the later *qui tam* complaint in order to trigger the public-disclosure bar." *Garman*, 719 F. App'x at 463 (quoting *U.S. ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1174 (10th Cir. 2007)). All that is required is a "substantial identity" between the publicly disclosed allegations and the allegations in the *qui tam* action at hand. *Id.* (citing *Poteet*, 522 F.3d at 514).

Relator argues that the allegations in his Amended Complaint are not "based upon" public disclosures, as they "involve an entirely different time frame, different victims, and different financial transactions and reimbursements." He relies on *United States ex rel. Ibanez v. Bristol-Myers Squibb Company*, in which the Sixth Circuit reasoned that "allegations that the scheme either continued despite [an] agreement[] or was restarted after the agreement[] are different. It cannot be assumed that the government is aware a fraudulent scheme continues (or was restarted) simply because it had uncovered, and then resolved, a similar scheme before." 874 F.3d 905, 919 (6th Cir. 2017). The *Ibanez* Court noted that this is especially applicable in situations where "the new allegations are temporally distant from previously resolved conduct." *Id.* at 919 n.4 (*citing United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 352–53 (S.D.N.Y. 2014) (discussing how long a relator must wait to avoid triggering the public disclosure bar)); *see also*

---

[5] The 2010 amendments to the public disclosure bar does not affect the analysis at this step because the Sixth Circuit had already interpreted the previous "based upon" language to mean a "substantial identity." *Garman*, 719 F. App'x at 463; *see also United States ex rel. Stratienko v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 958 F. Supp. 2d 846, 856–57 (E.D. Tenn. 2013) ("[T]he general case law pertaining to the public disclosure bar would still be applicable to this Court regardless of if it was decided before or after the PPACA.") (citing *United States ex rel. Osheroff v. HealthSpring, Inc.,* 938 F.Supp.2d 724, 732 n.10 (M.D. Tenn. 2013)).

8

*United States ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 45 (D. Mass. 2014) ("Engaging in a scheme to defraud cannot immunize a fraudulent action from *qui tam* suits regarding related forms of fraud in perpetuity; what was once a hot trail of fraud must cool at some point.").

However, Defendants distinguish *Ibanez* from the instant case by noting that the Corporate Integrity agreement in *Ibanez* only required the adoption of "procedures and programs designed to ensure compliance with the FCA [and] the Anti-Kickback Statute" without any review or reports submitted to the government. *Ibanez*, 874 F.3d at 912. Here, Korban entered into an Integrity Agreement with the government that was in effect from November 2013 through November 2016. The IA required selection of an Independent Review Organization ("IRO") to (1) review Korban's coding, billing, and claims submission to federal healthcare programs and the reimbursement he received for procedures he performed and (2) evaluate and analyze the medical necessity and appropriateness of interventional cardiac procedures. The IA tasked the IRO with submitting quarterly reports on their findings to the OIG. The two are not similar—one requires implementation of new policies, the other requires substantial independent oversight, review, and reports to the government.

In the current action, Maur alleges that this "exact scheme was previously detailed and exposed in a prior qui tam" in which the "central allegations . . . were that Defendants had billed Medicare and Medicaid for medically unnecessary cardiac stent placements" and "were in violation of AKS and Starks laws based upon unlawful financial arrangements between certain hospitals and Dr. Korban." (Am. Complt. ¶ 40–41, ECF No. 25.) Maur states, "[T]he instant complaint make[s] nearly identical claims" to the fraud disclosed in the *Deming* action, alleging that the same fraudulent scheme "persist[s] to this day." (*Id.* at ¶ 41.) Maur further avers that "these very practices were at the center of [the *Deming*] qui tam suit and related Department of

9

Justice investigations . . . ." (*Id.* at ¶ 53.) Before listing the specific patient examples, Maur even states, "There are no unique new details or dramatic twists to the aforementioned scheme, which was previously investigated and seemingly resolved. Rather, Dr. Korban is simply up to his old tricks . . . ." (*Id.* at ¶ 66.) In doing so, despite his argument to the contrary, Maur admits that the allegations in his Amended Complaint are "substantially the same" as those publicly disclosed in the *Deming* action.

The Amended Complaint lifts phrases verbatim from the *Deming* complaint and amended complaint. For example, both complaints assert that Defendants were involved in the "blatant overutilization of cardiac medical services" that were medically unnecessary, which in turn filled operating rooms at participating hospitals, enabling Defendants to "defraud the government and collect substantial government payments to which they were not rightfully entitled, to the detriment of the government and its taxpayers." (*Id.* ¶¶ 1, 10; *Deming* Complt. at p. 2, ECF No. 54-2; *Deming* Am. Complt. ¶ 3, ECF No. 51-3.) Both complaints further claim that Korban's "abuses were obvious and blatant from the very start of his practice" and that he "performed up to 18 catheterizations on Saturdays and up to 10 on Sundays. These numbers alone (not even the catheterizations done during the week) were excessive and would have raised a red flag about unnecessary procedures." (Am. Complt ¶ 51, 53; *Deming* Am. Complt ¶ 67, 69.) Both complaints allege that the Defendant hospitals "billed Medicare for services related to Dr. Korban's stent placements . . . and other unnecessary medical procedures, even though these procedures, tests, and stent placements were not medically indicated and were unnecessary" and then "falsely or fraudulently certified that the hospital services were medically indicated and necessary for the health of the patient." (Am. Complt ¶ 62, 64; *Deming* Am. Complt ¶ 93–96.) Although Maur includes several new Defendants, and describes different specific patient examples, there is not

only "substantial identity" between the fraudulent scheme he alleges in his Amended Complaint and the fraudulent scheme that the *Deming qui tam* action publicly exposed—it is the same fraudulent scheme.

*C. Original Source*

Finally, this Court finds that Relator Maur is not an original source of the information in his complaint. The FCA defines "original source" as

> [A]n individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. 3730(e)(4)(B).

The Sixth Circuit has interpreted the first category to mean that the relator must "have 'direct and independent knowledge or the information on which the allegations are based' and [] have disclosed that information to the government before any public disclosure occurred." *Garman*, 719 F. App'x at 463 (citing *Poteet*, 552 F.3d at 515). Relator does not claim to have voluntarily disclosed any information to the government before the *Deming* action. Therefore, Relator does not fit the first category definition of an original source.

The second category requires that the information provided by the relator "materially add" to the publicly disclosed allegations and voluntarily provide the information to the government *before* filing a qui tam action. This includes only information that "would affect a person's decision-making, is significant, or is essential." *Id.* (quoting *United States ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016)). "Qui tam complaints that 'merely add details to *what is already known in outline*' do not materially add to the publicly disclosed fraud." *Id.* (emphasis added) *(quoting Advocates for Basic Legal Equal.,*

11

816 F.3d at 432); *United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 213 (1st Cir. 2016).

Even if Maur had voluntarily disclosed the fraud he alleges in his complaint to the government,[6] the only different allegations Relator Maur provides are specific patient examples of the exact scheme that the *Deming* action publicly disclosed. The alleged scheme would proceed as follows. Korban would order medically unnecessary cardiac tests and procedures that necessitated the use of specific equipment or an operation room—whether at his own clinic or at a complicit hospital. He would then perform the medically unnecessary tests and procedures. He, his clinic, and the complicit hospitals would then bill Medicare. The existence of the IA does nothing but confirm that the government was on notice of Korban's "perpetual modus operandi" and put a system in place in an effort to ensure that his fraudulent practices would not continue.[7] (Am. Complt. ¶ 11.) Because Maur does not provide information that materially adds to the prior publicly disclosed information, he is not an original source.

In sum, the allegations that Relator includes in his Amended Complaint are substantially the same as those publicly disclosed in the *Deming* action and the subsequent press releases

---

[6] Maur's Amended Complaint makes conflicting statements on this issue. He states, "But for Dr. Maur *bringing this information to light in the form of this complaint*, these schemes would continue ad infinitum." (Am. Complt. ¶ 14.) Yet elsewhere he states that "he has voluntarily provided the information to the government prior to filing this Complaint." (*Id.* ¶ 26.) This Court is inclined to find that the latter statement is a conclusory statement, devoid of specific facts sufficient to survive a motion to dismiss.

[7] Relator offers no argument to the contrary, as the case law on which he relies interprets the pre-2010 amendment version of the "original source" definition. Before the Affordable Care Act passed in 2010 and amended the False Claims Act, under the public disclosure bar, an "original source" was defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. 3730(e)(4)(B) (1994). Whether or not Maur's knowledge of the fraudulent scheme is "direct" is immaterial to the analysis under the current version of the statute.

covering the settlement of that action. Relator does not qualify as an original source of the information in his Amended Complaint. Therefore, Relator's *qui tam* action is barred by the public disclosure bar.

## II. Failure to State a Claim

Defendant CHS did not explicitly raise the public disclosure bar in its Motion to Dismiss. Therefore, in this section, this Court will solely focus on whether Relator Maur's Amended Complaint states a claim upon which relief can be granted against CHS.

While a complaint that alleges violations of the FCA must meet the general pleading requirements to state a claim for relief under Rule 8, it must also meet the heightened Rule 9(b) standard and plead allegations of fraud with particularity. *United States v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 958 F. Supp. 2d 846, 854 (E.D. Tenn. 2013) (citing *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 466 (6th Cir.2011)). Plaintiff must allege "(1) 'the time, place, and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury." *Chesbrough*, 655 F.3d at 467 (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 504 (6th Cir.2007)). "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their conduct." *Bledsoe*, 501 F.3d at 503. "The heightened pleading standard is also designed to prevent 'fishing expeditions,' to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters." *Id.* at 466–67 (internal citations omitted).

*A. Count I – 31 U.S.C. § 3729(a)(1)(A)*

To state a claim under 31 U.S.C. § 3729(a)(1)(A), a relator must allege: (1) the defendant made a false statement or created a false record; (2) with scienter; (3) that was material to the

13

government's decision to make the payment sought in the claim; and (4) that the defendant presented to the government. *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 830 (6th Cir. 2018). In the Sixth Circuit, "pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *Bledsoe*, 501 F.3d at 504.

Defendant CHS argues that Relator's allegation that CHS "indirectly" filed claims to the federal government "for the hospitalizations and facility fees related to the unnecessary procedures" fails to accomplish this. (Am. Complt. ¶ 37.) Relator attaches 67 pages of medical records for the specific patient examples, none of which mention CHS. These medical records show that patients underwent cardiac procedures at the hand of Dr. Korban in Defendant hospitals' facilities but in no way establish that CHS submitted false claims to the government for payment for services rendered to those patients. Further, in the Amended Complaint, Relator repeats the following generic statement after each specific patient example: "Dr. Korban performed unnecessary [testing and procedures] on this patient, which was billed to, and paid for, by Medicare." Relator does not allege the date of any specific claim, who submitted any specific claim, the amount of any specific claim or whether any fraudulent claim was, in fact, paid.[8] Relator merely guesses that because the patient was insured by Medicare to some extent, Medicare was billed for all services rendered. Thus, the Amended Complaint fails to meet the heightened 9(b) standard—and likely fails to even meet the plausibility standard with respect to CHS—by failing to allege at least one specific claim that was submitted to the government for payment. This Court

---

[8] This Court will not address Relator Maur's argument that CHS is vicariously liable for the alleged wrongful acts of its alleged subsidiaries. Even if this were true, Relator Maur's failure to plead even one actual false claim that was presented to the government by any Defendant equally fails to state a claim against CHS's supposed subsidiaries.

therefore finds that Relator fails to state a claim against Defendant CHS for submitting false claims to Medicare, in violation of 31 U.S.C. § 3729(a)(1)(A).

*B. Count II – 31 U.S.C. § 3729(a)(1)(B)*

To state a claim under 31 U.S.C. § 3729(a)(1)(B), "the relator must allege that the defendants knowingly made or used, or caused to be made or used, a false record or statement *material to a false or fraudulent claim*." *United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-00484, 2013 WL 146048, at *17 (M.D. Tenn. Jan. 14, 2013) (emphasis added). Failure to identify a false or fraudulent claim—with particularity—subjects a claim under this provision to dismissal. *Id.* As discussed above, Relator fails to identify any false claim with particularity. This Court therefore finds that Relator fails to plead, with particularity, that Defendant CHS made false records material to the payment of the false claims.

*C. Count III - 31 U.S.C. § 3729(a)(1)(G)*

Although the "reverse false claims" provision "does not require presentment of a claim to the government, it does require 'proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation'—a duty to pay money or property." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (quoting *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.,* 190 F.3d 729, 736 (6th Cir.1999)). Relator Maur has not identified in his Amended Complaint any concrete obligation owed to the government by CHS at the time an allegedly false statement was made. Rather, he merely alleges that CHS and the other Defendants "shielded themselves . . . from any scrutiny or oversight in order to protect their profit stream" and "defraud[ed] the government and collected[ed] substantial government payments to which they were not rightfully entitled." (Am. Complt. ¶ 10.) This Court therefore finds that Relator fails to

state a claim against Defendant CHS for making false records at a time it owed the government an obligation.

    *D. Count IV - 31 U.S.C. § 3729(a)(1)(C)*

"To plead conspiracy to violate the FCA under Section 3729(a)(1)(C), a relator must allege facts that establish the existence of both an unlawful agreement to have a false claim paid and at least one act performed in furtherance of the conspiracy." *United States, ex rel., Prather v. Brookdale Senior Living Comtys., Inc.*, No. 3:12-CV-00764, 2015 WL 1509211, at *17 (M.D. Tenn. Mar. 31, 2015) (citing *U.S. ex rel. Farmer v. City of Houston,* 523 F.3d 333, 343 (5th Cir.2008)). "Under Rule 9(b), general allegations of a conspiracy, without supporting facts to show when, where or how the alleged conspiracy occurred, amount to only a legal conclusion and are insufficient to state a cause of action. *Dennis*, 2013 WL 146048, at *17 (citing *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106–07 (9th Cir.2003)).

The amended complaint fails to allege any of the requisite elements of a conspiracy with the requisite specificity. Relator pleads no facts that show when, where or how any alleged agreement between CHSI and the other Defendants occurred. This Court therefore finds that Relator's Amended Complaint fails to plead, with particularity, that Defendant CHS conspired with the other Defendants to defraud the government.

## CONCLUSION

Relator Maur's *qui tam* action is barred by the public disclosure bar, as the allegations therein are substantially the same as the allegations at the center of a previous *qui tam* action, filed in 2007. Relator Maur is not considered an original source under the statute, so the public disclosure bar requires that this action be dismissed. Relator Maur also fails to state a claim against Defendants CHS for defrauding the government in violation of the False Claims Act. Therefore,

the Defendants' Motions to Dismiss are **GRANTED**, and Relator's *qui tam* action is **DISMISSED**.

    **IT IS SO ORDERED.**

                                        **s/ S. Thomas Anderson**
                                        S. THOMAS ANDERSON
                                        CHIEF UNITED STATES DISTRICT JUDGE

                                        Date:   February 25, 2020.